```
1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2                          ORLANDO DIVISION
                       CASE NUMBER 6:18-mc-14
3


4     . . . . . . . . . . . . . . .
                                     :          Orlando, Florida
5     IN RE:  ADA CASES              :          August 15, 2018
                                     :          9:56 a.m.
6     . . . . . . . . . . . . . . .


7


8


9            TRANSCRIPT OF SHOW CAUSE HEARING
           BEFORE THE HONORABLE DANIEL C. IRICK
10              UNITED STATES MAGISTRATE JUDGE


11


12    INTERESTED PARTIES:


13                    Anthony J. Perez


14                    Alfredo Miguel Garcia-Menocal


15


16


17


18


19


20


21    Court Reporter:     Amie R. First, RDR, CRR, CRC, CPE
                          Federal Official Court Reporter
22                        401 West Central Boulevard, Suite 4600
                          Orlando, Florida  32801
23                        AmieFirst.CourtReporter@gmail.com


24    Proceedings recorded by FTR Gold Digital Recording.


25    Transcript produced by Computer-Aided Transcription.
```

<u>**INDEX OF PROCEEDINGS**</u>

<u>**WITNESSES**</u>

Anthony J. Perez   ........................   17

Alfredo Miguel Garcia-Menocal   ...........   43

```
 1                    P R O C E E D I N G S

 2                          * * * * *

 3           THE DEPUTY CLERK:  Case Number

 4   6:18-mc-14-ORL-31DCI, In Re:  ADA Cases, Thomas A. Bacon,

 5   PA, et al.

 6           Counsel, please enter your appearances for the

 7   record.

 8           MR. PEREZ:  Anthony J. Perez from the law firm of

 9   Garcia-Menocal & Perez.

10           MR. GARCIA-MENOCAL:  Alfredo Garcia-Menocal for

11   the law firm of Garcia-Menocal & Perez.

12           THE COURT:  All right.  Good afternoon.

13           MR. PEREZ:  Good morning, Judge.

14           THE COURT:  Or sorry.  Good morning.  I apologize.

15           You all can have a seat.

16           MR. PEREZ:  Thank you, Your Honor.

17           THE COURT:  Let me get set up and logged in here.

18           MR. PEREZ:  Is it all right if we pour some water,

19   Your Honor?

20           THE COURT:  Yeah.  Go ahead.

21           MR. PEREZ:  Thank you.

22           THE COURT:  All right.  As you may or may not be

23   aware, I've been setting these hearings.  I had two

24   hearings yesterday, one in the morning and one in the

25   afternoon.  I have this hearing.  And then I have a hearing
```

1    with Mr. Bacon on April -- excuse me, August 21st.

2            I'm setting these hearings pursuant to the

3    District Court's order in this case.  And I just want to go

4    through and kind of set the groundwork for what we're doing

5    here and why we're doing it.  And then I would like to hear

6    from each of you in turn.

7            I've read your written responses.  I think,

8    frankly, you all have probably the most appropriate

9    response in terms of things you're doing to make this

10   right.

11           Nevertheless, there have been some issues recently

12   that I'd like to discuss with both of you to make sure that

13   the -- what you plan to implement is actually working.

14   Because it at least has not worked in a few instances in

15   the past couple months.  So we want to discuss that as

16   well.

17           But let me, as I've done before, lay the

18   groundwork.  Some of what I'll say may not necessarily

19   apply directly to you all because you're in somewhat of a

20   unique relationship in that you're both two partners on the

21   cases and there's not necessarily a supervisor/supervisee

22   relationship to the extent we've seen in other cases.

23           Where Mr. Lopez, for example, was the supervisor

24   of several attorneys who were much junior doing this; and

25   Mr. Bacon supervises separate attorneys that are not

1  necessarily associated with his firm but are much junior,

2  less experienced than him.

3         So some of these rules apply more appropriately to

4  those people than you, but I just want to go through this

5  so we all have the same record.

6         As you all know, in February of this year,

7  Judge Dalton, United States District Judge Dalton entered

8  an order initiating these proceedings.  He assigned Senior

9  United States District Judge Presnell to proceed over them

10  as well as me as the assigned magistrate judge on these

11  cases.

12         In Judge Presnell and Judge Dalton's orders, they

13  stated that we are having these proceedings because there

14  are counsel in ADA cases who routinely fail to comply with

15  the Court's orders.  A number of attorneys were identified

16  as well as you all.

17         I then entered an order to show cause in which I

18  identified some of the concerns that the Court is having in

19  relation to these ADA cases.  And I stated that these

20  proceedings really focus on repeated failures to comply

21  with the Federal Rules of Civil Procedure, the Court's

22  Local Rules, orders of the Court.  And I also identified

23  some common deficiencies in ADA complaints filed by counsel

24  that were at least somewhat at issue.

25         And I requested that all counsel address four

things:

One, why they repeatedly failed to comply with the Court's orders and rules of the Court.

Two, why sanctions can or should be imposed as a result of those failures.

Three, why counsel should not be banned from filing additional ADA cases before the Court.

And four, in the alternative, what steps can and will be taken immediately to ensure future compliance with this Court's orders and the rules of the Court.

Now, let me say at the outset that these proceedings are really about compliance.  That's what they're about.  We simply want compliance with the rules and the orders of the Court.

This is not a punitive proceeding.  Sanctions are in play, and I'll discuss those as well.  But those sanctions are meant to ensure compliance with rules and not to punish.

And to the extent sanctions are appropriate and deemed appropriate by the District Judge, then they will be issued.  But, again, the purpose of them is simply to ensure compliance.  And I stress that several times because that is really what we're doing here.

I also told all counsel -- and I want to impress upon you -- that this is not about the Americans with

```
 1   Disabilities Act.  It just happens that counsel bringing
 2   cases under the ADA have the same pitfalls over and over
 3   again, and it's come to the attention of the District
 4   Court.
 5           So this isn't about the substantive issues in the
 6   case.  It's simply about compliance, mostly with things
 7   like deadlines and filing requirements, and that's it.  And
 8   the fact that it happens to be in the context of the ADA is
 9   just what it is.
10           Many years ago it was in the context of the Fair
11   Labor Standards Act.  And it just happened to be that
12   attorneys filing FLSA cases had the similar pitfalls and
13   failed to comply in the same way.  So we had a similar
14   proceeding in those cases.
15           So that segues me to the definition of negative
16   orders which I want to discuss with you all a little bit.
17           It was in my order that there are negative orders
18   that we're talking about, and negative orders were
19   identified as several kinds of orders.  And I want to
20   discuss generally the two kinds of negative orders that I
21   identified.
22           One is orders concerning orders to show cause,
23   failure to comply with rules or orders, orders striking
24   documents for failure to comply with rules and orders, and
25   orders dismissing cases for failure to prosecute or
```

1   otherwise comply with the court rules and orders.

2        Now, those are undoubtedly negative when you get

3   them, and they relate to procedural issues and really are

4   directed to counsel.  So I think those are most

5   appropriately deemed negative orders.

6        Now, the other kind of negative orders that were

7   discussed were orders that dealt with -- usually with

8   motions, motions to dismiss, orders to show cause

9   concerning separation of cases into multiple cases when

10  alike parties are joined together, more substantive issues.

11       In relation to those, orders were issued that

12  either denied motions, dismissed cases, or severed cases

13  and required refiling.

14       Now, if you were a recipient of those orders, I

15  can't think that they are undoubtedly negative.  They were

16  some negative thing where they were denying the motion,

17  they were dismissing the case.  And so that's why they're

18  deemed negative orders.

19       Now, this proceeding is not about the substantive

20  law at issue in those orders.  So you can take whatever

21  position you like concerning the substantive law and appeal

22  it as appropriate to the next court if you don't agree with

23  the law.  And that's not the purpose of these proceedings.

24       In relation to those orders and motions that are

25  at issue, we deem them negative because what we're seeing

```
 1    is the same legal arguments over and over again without any

 2    respect for the fact that the Court is denying them on

 3    certain grounds.

 4          So if they were to be denied three, four, five

 5    times on one ground, we see the same motion over and over

 6    again without even addressing or attempting to address the

 7    concerns of the Court.  That's why we deem them negative.

 8          And perhaps that's because the form of the

 9    pleadings, perhaps that's because in some cases it's been

10    sloppy lawyering, but we feel that the Court's orders

11    should be addressed at least.

12          And whether that's addressed by appeal or just

13    addressed in the argument, we think that the issues that

14    we're addressing are meritorious for discussion and not

15    simply ignored and the next motion is filed.  So that's why

16    we consider them negative orders.

17          And those kind of substantive issues are not --

18    will not be the subject of sanctions in this case to the

19    extent sanctions are issued.  The sanctions will concern

20    the first kind of negative orders that I discussed.

21          But we thought it at least worthwhile to raise

22    this issue to you and hope that you understand the concerns

23    the Court has in the negative orders that are being issued

24    in relation to those and what we hope you can do to address

25    that as well as your perception with the Court.
```

```
 1          So those are -- that's a little bit of explanation

 2   about negative orders and what that means.  Because I know

 3   that was addressed in you-all's response as well as some

 4   other attorney's responses.

 5          And I also want to let you know to the extent --

 6   let you know a little bit about how these proceedings are

 7   intended to go.

 8          One is, I issue the order to show cause as

 9   directed by the District Court.  What will happen next is

10   after these hearings are concluded -- there is going to be

11   a hearing concerning Mr. Bacon, which is not until next

12   week -- I intend to do a report to the district judges

13   recommending some certain action.

14          Now, like any report and recommendation, you all

15   will have an opportunity to object to that and to further

16   state, you know, your side to the district judge to the

17   extent you think is appropriate.  And then the district

18   judge will actually be taking any action concerning

19   sanctions, admonishments, or any further actions in

20   relation to this.

21          I'll not be sanctioning you.  I will not be

22   sanctioning you today.  It will simply be by a report to

23   the district judge concerning what will happen.

24          Today is your opportunity to make your record.  So

25   anything you'd like to say to the Court, I will take into
```

1  consideration in making my report to the District Court.

2  And again, you'll also have an opportunity to make your

3  case to the District Court to the extent you'd like to file

4  an objection to my report.

5      So let me at least discuss with you a little bit

6  -- you can address this if you feel it's appropriate -- the

7  kind of sanctions that the Court is considering.

8      This is not an exclusive list.  So whatever power

9  the District Court has, this is not intended to limit that

10  power in any way.  But these are things that I'm thinking

11  about recommending some or all of these as to some or all

12  counsel.  So let me just go over them.

13      One is simply admonishment, written admonishment

14  to follow the rules and the orders of the Court.  That's

15  one possible sanction.

16      Another enforcement just may be to require

17  periodic notices whenever orders to show cause are filed

18  against counsel for orders dismissing cases for lack of

19  prosecution or some other -- or orders striking documents

20  that are inappropriately filed in violation of the rules.

21      And perhaps this period of time will run for

22  six months or a year at which point the Court would

23  reconsider further proceedings and take it from there.

24  That's a possibility in this action.

25      Another possibility would be to require hard

```
 1   signatures on all filings.  It's come to the Court's

 2   attention or at least the Court suspects based on the kind

 3   of filings we're getting that perhaps these filings are not

 4   being reviewed by an attorney before being made with the

 5   Court.  And I'm going to go over some of the Local Rules

 6   and some of the Florida Bar Rules concerning that.

 7        But it's very important that any filing with this

 8   Court be reviewed by an attorney before it be filed with

 9   the Court.  And I think that would solve at least some of

10   the issues that we're seeing.

11        And this came up yesterday.  This may not have to

12   do specifically with you.  But we've seen motions for

13   default judgment, they're 20-page motions that are just

14   clearly a form, a 20-page form that's filed over and over

15   again in cases, really has nothing to do with the complaint

16   in any given case.  And we feel that if attorneys were to

17   review those documents, that wouldn't happen.

18        We've also seen notices of appearance possibly

19   being filed without attorneys' knowledge.  This may --

20   again, may not apply to you two as much as it applied to

21   others.  But for junior attorneys who come online on a firm

22   and all of a sudden they see that they have 40 cases in

23   which they appear on, they have no idea, they didn't

24   authorize that, and that's happened in relation to these

25   cases.  And I want to address that as well.  And hard
```

```
 1    signatures on filings, we'll deal with that.

 2            There also may be a requirement that any new case

 3    filed as a part of the notice of related cases that this

 4    case, 6:18-mc-14, being noticed as a related case so

 5    that other courts will be aware of these proceedings.

 6    That's something we're possibly thinking of.

 7            Perhaps most serious would be a recommendation to

 8    the grievance committee to create a report for the Board of

 9    Judges concerning one additional sanction to be imposed as

10    well as possible referral to the Florida Bar for

11    discipline.  That would probably be one of the more severe

12    sanctions that's being considered.

13            I want to go over some of the rules that are

14    influencing the Court's determinations here.

15            First is Local Rule 1.05(d), which requires that

16    all documents and pleadings filed in this Court be

17    personally signed by counsel in compliance with Rule 11.

18            In addition, under Local Rule 2.03(a), every paper

19    that's filed with the Court is subject to Rule 11 and

20    constitutes a general appearance.

21            Now, I understand that you two often make

22    appearances on both cases.  And I just want to impress to

23    you, as I've impressed to others, that if you do make

24    appearance in a case, that's a general appearance for all

25    purposes.  And you're both responsible for every deadline,
```

```
 1    every filing requirement, every rule.  Both of you are
 2    responsible.
 3             And there's no such thing as far as the Court's
 4    concerned as an attorney appearing just as a supervisor or
 5    for any other purpose but a general appearance.
 6             Local Rule 2.04(d) states that the Florida Bar
 7    rules apply to those attorneys practicing before this
 8    Court.  And I want to go over some of those rules that are
 9    in play here.
10             Rule 4-1 is competence.  Competent representation
11    includes not only the knowledge and the skill but the
12    thoroughness in preparation reasonably necessary to
13    practice.
14             Rule 4-1.3 concerns diligence.  Here it's required
15    that you be reasonably diligent and prompt.  And the notes
16    to this rule in particular state that workload must be
17    controlled so that each matter can be handled competently.
18             Now I'd like to discuss with both of you when it's
19    your opportunity to speak how many cases you're handling in
20    federal court.  But I've heard numbers well in excess of
21    100, and that's difficult for any attorney.  So I'm not
22    sure how attorneys who are handling that number of cases
23    expect to keep up with the deadlines that are necessary in
24    these kinds of cases if that's your caseload.
25             And that's something that not only concerns the
```

1    Court but would be a violation of the Florida Bar Rules if

2    you're handling more cases than you can handle.

3           4-3.3 concerns candor towards the tribunal, states

4    that an attorney shall not fail to disclose to the tribunal

5    authority in the controlling jurisdiction known to the

6    lawyer to be directly adverse to the position, the client,

7    and not disclosed by opposing counsel.

8           Now, where I think this comes into play some --

9    perhaps this is not directly on point -- is these negative

10   orders that concern substantive law.  And that's why we're

11   raising those and these issues.

12          Because when the Court, or when this Court issues

13   orders directly on point denying motions and requests for

14   separating complaints and dismissing them and then we get a

15   motion or a response to an order to show cause that doesn't

16   address at all these concerns we've raised over and over

17   again, we feel that there's some issue of candor,

18   especially when one judge is not being advised when another

19   judge has just dismissed a case on exactly this point in

20   this courthouse.

21          So those are the kind of issues we have concerns

22   about there.  We want you to address the issues we're

23   raising in our orders.

24          Next, I want to discuss the 5 series of rules.

25          Now, 4-5.1 is that partners in law firms are

1    obviously responsible to supervise any associates or others

2    who work for them and make sure as reasonably as they can

3    that attorneys under them are complying with the Bar rules.

4         4-5.3 concerns responsibilities over nonlawyers.

5    It's the ultimate responsibility of the lawyer to comply

6    with the rules.

7         And 4-5.4 concerns professional independence of

8    the lawyer.  Lawyers shall not share legal fees.  And in

9    particular a nonlawyer shall not regulate the lawyer's

10   professional judgment in any way.

11        This is a thing, this is an issue that I've

12   discussed with other counsel -- I'd like to discuss with

13   you all as well -- in particular as it concerns experts and

14   their roles in these cases and their roles and their

15   relationships with the client and whether or not they're

16   exercising more authority and control than they should be

17   in these cases.  Because it's the professional independence

18   of the lawyer is key to litigation.

19        So those are the concerns I have.  I'd like to

20   hear from each of you.  I'll give you an opportunity to

21   make whatever statement you'd like to make and to make your

22   record before the Court.  And then I have some follow-up

23   questions as well.

24        So whoever would like to proceed first can

25   proceed.

1          MR. PEREZ:  Good morning, Your Honor.

2          THE COURT:  It might be best to speak from the

3    podium as well.

4          MR. PEREZ:  Thank you, Your Honor.

5          My name is Anthony J. Perez, I mentioned earlier.

6    I appreciate the opportunity for you to listen and also to

7    hear our side of it.

8          First off, we're embarrassed professionally.  We

9    stand for excellence, especially in defending people that

10   don't have much of a voice oftentimes, the disabled.

11         We started doing this work primarily because I was

12   getting -- or we were doing help for disabled veterans.  As

13   a retired Marine, it's important to me.

14         And, in fact, the first ADA case we did was an

15   employment discrimination case, a wrongful discharge.  And

16   that kind of got the attention of some of the advocates in

17   the disabled community, and we started doing some of this

18   work.

19         We're proud of the work we do with the exception

20   of not meeting some of the non-substantive deadlines.  I

21   understand what you're saying with regard to substantive

22   issues.  In fact, you know, we try to grow as we progress

23   with the cases.

24         This is a common law system, as I'm sure the Court

25   is well aware.  So oftentimes the adversarial nature of a

1    proceeding will require, you know, that we take different

2    positions.  And the Court obviously has to be interpreting

3    the prior interpretation of that statute or case law.

4          To that end, what we've done at times is we've

5    filed as additional authority or supplemental authority

6    cases decided within this district on the same or similar

7    issue.  For instance, we've filed orders from Judge Dalton

8    in regards to standing for issue -- for example.

9          In regards to the joinder issue, which has come up

10   quite a bit, our position has been -- and we've recently

11   changed it up in an amended complaint.  Because as we did

12   more research, we learned more.  As we read the Court's

13   order and judgment, those that give us a particularly

14   insightful order that we took to heart.

15         We believe that in regards to joinder, when it

16   comes to landlord/tenants, there's common areas that they

17   all benefit from and are responsible for.  And we've

18   adjusted.

19         The other issue in joinder that we may not have

20   flushed out as well has been more along the lines of the

21   fact that similar to a 1367 ancillary type of argument, if

22   all of this stems from the same nucleus operative fact, the

23   same visits, same plaintiff, and they all share common

24   areas, we've kind of felt that there's some claims that

25   aren't related to all defendants that perhaps will be most

```
 1    economical for the judicial system as well as defendant to

 2    handle all in one case.

 3          I say that not to sway the Court as far as what

 4    we're arguing, but just to show the Court that we're making

 5    these arguments in good faith as well.

 6          In regards to the staffing, I believe that some of

 7    the issues as far as the negative orders that are based on

 8    not meeting deadlines or rules have had to do more with

 9    staffing and experience and honest mistakes that are made

10    in the calendaring system.

11          We have turned around and been redundant in our

12    new protocol that has flexibility built into it to make

13    sure we do so.  We have weekly meetings, sometimes twice

14    weekly, to go over every single case and even checked the

15    calendaring, not just defining substantive issues or going

16    through them with the staff, but hitting the calendar,

17    making sure we're accurate on filing things early.

18          Something else that we're doing is while we're

19    calendaring, if it's something that can be done right away,

20    we're tasking it out, supervising getting it done.

21          In regard to roles, my law partner and I have

22    different roles.  There is some overlap.  He kind of runs

23    the firm as a whole, does a lot more of the managerial

24    stuff because I can't do the substantive drafting and

25    editing and reviewing and still, you know, make sure the
```

```
 1    mortgage and everything else gets paid, the right people

 2    are hired and stuff like that.  I have input.  We talk

 3    several times a day on many issues.

 4         Same thing with his role in these cases.  He does

 5    a lot of the mediations either with or without me.  And

 6    oftentimes we'll -- well, actually, nowadays we'll do a

 7    line show to Rule 34 inspections, for example, to allow me

 8    the time to hit the more substantive stuff that I have to

 9    draft.  That doesn't mean he's without knowledge as well.

10    He reviews it and gives me the benefit of his insight on

11    that.

12         So in that regard, we've even become more -- we've

13    even developed more of an overlap just to kind of

14    spot-check each other and make sure we're compliant with

15    the Court.  Because, you know, it's the right thing to do,

16    Judge.

17         We implemented, in reality, two new calendaring

18    systems.  And as a result, we've given everybody clear

19    access to the entire calendars.  And we've required that

20    all staff have it on their phones so that you can check

21    stuff from home the night before, whatever, if need be, you

22    know.  I hope that doesn't lead to any FLSA issues later

23    on.  But, you know, we're trying to be super redundant in

24    this.

25         And in addition to this, I talked about protocols
```

```
 1    that involve cases, for instance, when we -- if we know of
 2    a certain judge's issue, related cases, orders, and
 3    interrogatories in a case, we're leaning forward and kind
 4    of having at least a draft done so that when the order
 5    comes through we can double-check it, finalize it, and file
 6    it long before the deadline.
 7          Some of the issues we deal with sometimes in
 8    regards to the deadlines have to do with some of the
 9    courtesies that we provide.  I'm saying that not to put the
10    blame on anyone else, Judge.  The buck stops here with me.
11    Okay?
12          And, but as you mentioned earlier astutely, we
13    have to have proper candor with the Court.  And I want to
14    give you some insight as to some of the stuff we deal with
15    so that I can be the most honest possible with you.
16          I don't turn down any extension, for the most
17    part.  There's got to be a very specific reason.  And when
18    there has been -- and I can't think of any right now -- my
19    protocol has been to call that attorney.
20          That sometimes shortens the space to do certain
21    things.  I'm not going to stop giving defense counsel
22    extensions, because it's the right thing to do.  That's
23    what civilized practice of law means to me.
24          However, what I am doing is right off the bat
25    we're asking for Rule 34 inspections.  Right off the bat,
```

1    we're putting out lists of mediators and giving them, you

2    know, deadlines long before to give us one or to put in for

3    the Court to assign one if we can't agree to it to try to

4    progress the case and meet with the Court's specific

5    antenna, the orders and rules to get these things timely

6    done.

7           We have hired additional staff and trained them.

8    And we required that they have a lot more experience.

9    Experience in state court versus federal court is very,

10   very different, Your Honor, as I'm sure you're aware.

11   We're looking for an additional attorney now.  We're

12   requiring federal experience.

13          You asked how many cases we have.  I don't think

14   it's quite a hundred.  I don't think we're quite at a

15   hundred.  Again, we're both dealing with them.  So I think

16   we're well within the range of being able to handle them.

17          You asked about some of the -- or you mentioned

18   some of the things that the Court is considering as far as

19   sanctions.  I would mention in my response that this order

20   in itself has to be acknowledged as a sort of sanction,

21   Judge.

22          We've dealt with it in its inclusion in some

23   responses.  We've dealt with it in a very public nature

24   where we've been approached by reporters.  We haven't said

25   anything.  We usually don't on any case, to be honest with

```
 1   you.  But it's been the source of some personal concern for

 2   us and our reputations, to be perfectly candid.

 3           And I think the Court should consider that because

 4   it does matter to us what the Court and what the public and

 5   what our colleagues think and believe.

 6           Judge, you said you wanted to ask some questions

 7   of me.  I'd be happy to respond to anything the Court has

 8   to ask.

 9           THE COURT:  Sure.  I mean, just a few comments and

10   some questions as well.

11           I mean, I understand you're saying you're having

12   issues with your staff.  But, you know, that's just not an

13   excuse to the Court.  And I know you said at the outset

14   you're not using it as an excuse, but it's just -- there's

15   no place for it.  The buck does stop with you --

16           MR. PEREZ:  Sure.

17           THE COURT:  -- and with your partner.

18           And these deadlines just have to be complied with.

19   There's just no room in failing to comply any longer.

20           MR. PEREZ:  Yes, sir.

21           THE COURT:  And as to defense counsel in these

22   cases, again, there's just no reason that if a deadline is

23   approaching you're not filing a motion to extend it as

24   opposed to blowing it.

25           You can't just let the deadline pass.  You have
```

```
 1    to, at the very least, request an extension.  The deadline

 2    should be met.  But if for some reason you can't meet it

 3    based on your good faith efforts to meet it, an appropriate

 4    request for an extension should be filed.

 5           And it shouldn't be filed on the day that

 6    something is due either.  You know, it should be enough

 7    planning in place to give the Court an opportunity to look

 8    at the motion and decide whether to grant it or deny it.

 9    And a request may be denied, and then you'll need to comply

10    with that order.  But just not complying with the orders is

11    not an option.

12           And in that vein, I mean, that's why I'd like to

13    discuss, you know, there have been some orders to show

14    cause already since this.

15           On July 24th, 2018, Judge Conway did an order

16    to show cause because -- it was related to the outcome of

17    mediation.  I suppose the case settled.

18           MR. PEREZ:  Can I respond to that, Judge?

19           THE COURT:  Sure.  But all the deadlines had

20    passed and --

21           MR. PEREZ:  We implemented another protocol,

22    Judge, in direct response to that.  And I'm glad you

23    brought it up.

24           Sometimes these cases settle prior -- or they're

25    globally resolved -- because we are subject to confidential
```

1    agreements.  They are globally resolved prior to mediation.

2    That's where a gap occurred when we were trying to craft an

3    agreement referencing that easily confidential one, as I

4    mentioned.

5           What we've done to protect against failing on that

6    deadline is now upon resolving a case, we send a notice of

7    settlement or a notice of global resolution to the other

8    side immediately, often that day, never more than a day

9    later.  And we file it once we agree to the language.

10          And within that, we often say within 30 days,

11   whatever period of time we're going to -- because sometimes

12   with a corporate defendant, they got to go up several

13   layers.  It's not that the attorneys aren't cooperating.

14   It's just they got their protocols.  And I respect that.

15          But this allows the Court to know that it's

16   resolved.  And we're -- and it's not going to be mediated

17   or it was resolved in mediation, whatever it might be.

18          And this way, I mean, we can't blame a mediator.

19   We're responsible.  And as I said earlier, the buck stops

20   here.  But I think that solves that.  If we have -- if we

21   don't see that the mediator has filed an outcome on

22   something, we're -- you know, there's been a few times

23   since then that we filed it.  And that order prompted that,

24   Judge.

25          THE COURT:  Well, you do have an obligation under

```
 1    the Local Rules to let us know when a case is settled.  And
 2    when a case is settled, generally what the Court does is a
 3    60-day order.  I'm sure you all are familiar with that.
 4          But even if settlement hasn't concluded yet and
 5    you're waiting for those levels of approval, the deadlines
 6    still apply in a case.  And unless you get them extended,
 7    you still have to comply even during settlement
 8    negotiations or during the approval process for settlement.
 9          No deadlines the Court sets can be stopped by
10    agreement between the parties or by pending settlement
11    without a further order of the Court.
12          And I think that's key.  And I know that's not the
13    same as in state court perhaps, but that's how it is here.
14          MR. PEREZ:  It's night and day with state court.
15    But I understood, Judge.
16          THE COURT:  Okay.
17          MR. PEREZ:  And that's the process we've
18    implemented to try to avoid falling short on that in the
19    future.
20          THE COURT:  And just -- and there's actually four.
21    I just want to mention one other one is on June 6th,
22    Judge Presnell did an order -- excuse me.  On June 6th
23    you responded to an order to show cause from Judge
24    Presnell.  And, again, your response was a calendaring
25    error.
```

```
 1              This was in Longhini versus Lakeside Operating.
 2   I'm not sure if you recall that one or not, but it's
 3   another issue where an order wasn't complied with and
 4   delay.  And it was an order to show cause for dismissal for
 5   failure to prosecute.  And you ended up getting a
 6   stipulation of dismissal, and the case settled.
 7              But what concerns me about these is not any
 8   individual explanation but to make sure that whatever
 9   procedures you have in place are actually working.  Because
10   these have come since the Court has done this order that
11   you're rightly concerned about.
12              So since the Court has done this order to show
13   cause, there's still been four failures that I count
14   concerning court deadlines.  So I just want to make sure --
15   and that's why we may have some kind of process that goes
16   on for another six months or a year to make sure that
17   whatever you're implementing holds.
18              Because you're not the only ones, frankly.  There
19   have been other groups that have been targeted by these
20   orders to show cause that have continued to fail to comply
21   even despite the Court issuing the order that it has so
22   far.
23              And so we want to make sure that whatever you're
24   doing is working.
25              MR. PEREZ:  Understood, Judge.
```

```
 1              And this is why we applied the second calendering

 2   system as another check on that.  You know, we're being

 3   overly redundant, you know, rightly so.

 4              THE COURT:  And that's fine.  Like I said, I want

 5   to make sure you understand this is not about the Americans

 6   with Disabilities Act.  This is about compliance with court

 7   orders so --

 8              MR. PEREZ:  To be clear, we've never said that or

 9   even felt that, Judge.  We want to be compliant.  It's

10   important to us.

11              We view prestigious the work in federal court.  We

12   want to keep it that way.  We want to continue to be the

13   voice of who we feel is underrepresented, the disabled, in

14   regards to this.  So I share your concerns.

15              THE COURT:  That's fine.  And we're fully -- and,

16   you know, some attorneys that have come before the Court

17   have said, Well, we're not practicing ADA law anymore.

18   You're not saying that, and rightly so.

19              But I just want to -- that's why I've been -- I've

20   been repeating this because I want everyone, and you, to

21   understand that we just want you to comply with the orders,

22   rules and continue practicing as appropriately in federal

23   court.

24              MR. PEREZ:  Understood, Judge.

25              And we are going to continue practicing ADA law.
```

```
 1   We're part of the practice.  And it's important to us to
 2   give these people a voice.
 3            THE COURT:  Another issue -- and, again, this
 4   really isn't about the substantive issues, but you brought
 5   up the paring down the parties and some recent orders that
 6   have come out.
 7            It's been handled a couple different ways.  I just
 8   -- and this isn't really at issue in these proceedings.
 9   But I just want to let you know Judge Smith did what I
10   thought was a good order on this issue where in order to
11   preserve resources in the way you said, judicial and
12   defendants' resources, he required the filing of a
13   multi-count complaint as opposed to separate cases.
14            And count one was, for example, the plaza with
15   everybody concerning common areas.  Count two was retailer
16   one.  Count three was retailer two.  And then the plaza,
17   for example, to the extent it was appropriate.
18            And one of the issues that substantively
19   concerning splitting up the parties is you're requesting
20   joint and several liability in one count, a one-count
21   complaint for tenants that have nothing in common.
22            So I would just suggest you at least look at what
23   Judge Smith did in relation to that.
24            MR. PEREZ:  Thank you, Judge.  We're doing that
25   now.
```

```
 1              THE COURT:  Okay.

 2              MR. PEREZ:  We're having separate counts.  It's

 3    not just as to one of the defendants.  Oftentimes each

 4    count is as to two or more defendants.  And it defines the

 5    areas and the violations we're alleging and so forth.

 6              And then in the remedies that we're seeking, we

 7    ask for the relief of the whole.  And, quite frankly, we

 8    feel they have to define if there's an area after we put it

 9    out there and alleged that they're not responsible or don't

10    benefit from.

11              And I think that meets what the judge put out.

12    And that might be what I was thinking of in regards to

13    Judge Mendoza's order.  I think it was for a

14    (indiscernible).

15              THE COURT:  And it may not be (indiscernible).

16    Everybody may not accept that, but I think it's a good

17    start.  So I would just suggest you look at what -- some of

18    these that are happening.

19              Anyway, one other issue I wanted to discuss with

20    you is this issue of experts.  You represent Mr. Longhini

21    in a lot of cases.

22              MR. PEREZ:  That's one of our clients, yes, Your

23    Honor.

24              THE COURT:  And Mr. Longhini, I believe his victim

25    advocate is Mr. Childers.  Is that who you deal with?
```

1          MR. PEREZ:  We often deal with Mr. Childers, not

2     exclusively, though.  We have several experts, Your Honor.

3          THE COURT:  Okay.  Here's my concern, and I'd like

4     you to address this.  It's something that I've dealt with

5     with other counsel.

6          As the Court's understanding, how this has worked,

7     at least with some law firms, is that, frankly, in relation

8     to these cases, the person who has the most financial

9     incentive in these cases and the most financial stake in

10    all of these cases appears to be the expert.

11         And in many of these cases, that expert appears to

12    be Mr. Childers.  And from what I've heard, Mr. Childers is

13    not only an expert in many of these cases, but he's the

14    expert who makes the most money of the expert and that his

15    rate is perhaps discounted based upon the settlement

16    amounts so that there's a very high rate at the outset and

17    a discounted rate depending on what happens after that.

18         It's also my understanding from what I've heard

19    that Mr. Childers, for lack of a better term, controls

20    where the client goes to as far as the law firm.  And that

21    Mr. Childers brings clients to firms and if Mr. Childers is

22    not satisfied with the way cases are being handled that

23    Mr. Longhini no longer goes to those firms.

24         So I'd like you to address those issues and let me

25    know what your experience is with experts and in particular

```
 1    Mr. Childers.

 2              MR. PEREZ:  I'd be happy to, Your Honor.

 3              First off, nobody dictates what we settle for or

 4    whatnot.

 5              THE COURT:  Do they attempt to, though?  Is

 6    Mr. Childers attempting to dictate what the amount of money

 7    is that it settles for?

 8              MR. PEREZ:  No, sir.  And I'll be happy to

 9    elaborate.

10              For instance, I settled a personal injury case

11    against a governmental entity not too long ago.  And I had

12    medical liens that were in effect, and I negotiated those

13    liens down.

14              There are times that because of a settlement, I

15    might have to call my expert, whether it be Mr. Childers or

16    Mr. Baez or Mr. Patel or anybody else I use, and say, Hey,

17    listen, you know, I need you to negotiate this because this

18    is where I'm at with this and I can't get any more.

19              And if they do, that's fine.  I'm happy about it.

20    And if they don't, that will affect my decision on whether

21    to use them again in the future.

22              Bottom line.  Nobody dictates what we settle for.

23    Nobody tries to influence -- I've never dealt with that

24    issue.

25              In regards to who steers the clients, we've gotten
```

```
 1    clients as a result of indirectly or maybe even directly
 2    from experts before.  But as I mentioned earlier, I started
 3    doing some of this so I got my clients from the military.
 4            THE COURT:  I understand.  But this is -- so I
 5    understand.  I'm sure.  And I understand that you handle
 6    ADA cases for individuals.  Then there are testers who make
 7    up the bulk of these ADA cases.
 8            And even in your response to the Court, I think
 9    that in the first paragraph you state that the firm
10    commenced its plaintiff ADA practice after meeting some
11    disability advocates and plaintiffs.  And I'm concerned
12    that when you say that you're talking about the people who
13    end up being the experts in the cases.
14            MR. PEREZ:  It's a mix of people, Judge, who
15    probably -- we know Mr. Childers from before doing any work
16    with him, Judge, candidly.  So, I mean --
17            THE COURT:  How did Mr. Longhini come to the firm?
18            MR. PEREZ:  He asked Mr. Childers about other
19    attorneys, and he mentioned our name to him.  And
20    Mr. Longhini called me, and we set up a meeting.  We met
21    with him individually.
22            THE COURT:  So he came -- Mr. Longhini came into
23    the firm through Mr. Childers?
24            MR. PEREZ:  I believe so.
25            THE COURT:  Okay.
```

```
 1              MR. PEREZ:  But, for instance, Carlos Brito and

 2    some others didn't.  You know, sometimes it's from another

 3    attorney.  Sometimes it's from -- through some of the work

 4    I've done for disabled veterans.

 5              For instance, Mr. Stringham came to me, may he

 6    rest in peace, because he's a Vietnam-era veteran.  You

 7    know, through my work -- I don't remember which one it was,

 8    but through my work, you know, some of the volunteer work

 9    I've done.

10              THE COURT:  Does Mr. Childers discount his rate

11    based upon the settlement in the case?

12              MR. PEREZ:  Mr. Childers will reduce his fee, his

13    cost, if I -- if I can negotiate it with him on some cases,

14    not always.  It's an honest negotiation like anything else.

15              THE COURT:  Well, my concern is that the

16    negotiation bleeds into the settlement process of the

17    actual case.

18              MR. PEREZ:  It's after settlement that we do that,

19    Judge, most of the time.  I'm sure there's been an

20    exception to that, but I'm thinking in my mind the last few

21    times we've done it has been after.

22              Like I said, this is a little -- you know, can you

23    reduce it?  You know, I didn't do as well as I thought I

24    did or, you know, for whatever reason.  There might have

25    been --
```

```
 1              THE COURT:  Would you agree with me that the
 2    individual who has the most financial stake in any
 3    individual case is Mr. Childers?
 4              MR. PEREZ:  Financial stake?  Not necessarily.
 5              We put a lot of work into the fees and the work we
 6    do.  And, you know, we expect to be paid something fair for
 7    what we do.
 8              When we settle a case, I don't necessarily demand
 9    we get everything we get.  You know, there's some
10    give-and-take there.
11              And so I would say in most cases, the firm, if
12    you're just talking finances, you know, benefits from
13    receiving our fee.
14              THE COURT:  I'm sure the firm --
15              MR. PEREZ:  I've never paid an expert more than
16    we've made on any case, Judge, whether it's ADA or
17    something else.
18              THE COURT:  But that's for your entire firm?
19              MR. PEREZ:  Yes, sir.
20              THE COURT:  Okay.  And I'm talking about the
21    individual who has the highest financial stake.
22              MR. PEREZ:  Yeah, I -- I stand on my prior answer,
23    Judge, respectfully.
24              THE COURT:  It's just a concern for me because
25    I've had -- and perhaps not with you all but with some of
```

```
 1   the other attorneys, I've discussed it seems to me the

 2   cases are staffed by an expert and then a very junior

 3   attorney.

 4           And many of the times, we're seeing based upon

 5   some of the statements I've heard from counsel and some of

 6   the written responses, I have concern about the

 7   independence of the attorneys who are practicing here and

 8   who's actually driving these cases and what's happening in

 9   them.  And it needs to be the attorney under the Florida

10   Bar Rules.  And if it's an expert that's shopping around

11   clients, that's a concern.

12           MR. PEREZ:  Sure.

13           THE COURT:  And at least some of what I'm hearing

14   is being corroborated by you concerning who's bringing the

15   clients to the law firms and the financial stakes of people

16   involved.  I mean, this is not coming completely out of

17   right field.  I mean, there's something to this.

18           So you don't just represent Mr. Longhini.  Several

19   other law firms do as well.

20           MR. PEREZ:  I understand that, Judge.

21           THE COURT:  And one of the law firms that's coming

22   here no longer represents Mr. Longhini because Mr. Childers

23   was not satisfied with the representation.  And that's what

24   I've heard from the attorneys.

25           And so to the extent that somebody who is not a
```

```
 1   lawyer has that much control and that much financial stake

 2   in how these cases are being brought does raise a serious

 3   concern to the Court.

 4           So that's why I'm asking you to address it.

 5           MR. PEREZ:  Judge, (indiscernible) that's not the

 6   case.  My partner and I each have close to 20 years'

 7   experience.  And no expert is going to tell us how to --

 8   the tail is not going to wag the dog at our firm.

 9           And I'm glad you're mentioning that.  Because when

10   we do hire someone new, we'll make sure that's not the

11   case.

12           I think sometimes perhaps it's well-intentioned or

13   seeking insight for somebody that's been around the game.

14           I'll tell you point blank, the reason we use, we

15   often use Mr. Childers is because he has a total approach

16   to it and the detail in his reports are probably second to

17   none.

18           One of the things I mean by the total approach is

19   that we've used him in cases we've defended when we've had

20   a commercial client that's been sued for that.  But we've

21   used it prior to, oftentimes, with our commercial clients

22   where -- we really are advocates for the ADA, Judge.  We're

23   the real McCoy.

24           And we will tell our clients, You need to be

25   compliant.  And they may have, whatever, a number of
```

```
 1   filling stations, for example.  And we've used

 2   Mr. Childers to come up with a compliance plan for them

 3   even though they're not in litigation.

 4        Another aspect that he's brought to the table has

 5   been -- and I know this is -- I can think of at least one

 6   case in the Middle District that we had him -- we met with

 7   a pro se defendant.  And he's in the process of getting

 8   them -- I think it's actually their mediation work being

 9   done for free through a not-for-profit.  Because, again,

10   what we want is compliance.

11        And that's the other reason we have to cut our fee

12   or ask them, you know, the expert to cut their fee is

13   because, you know, we may even have been justified either

14   exerting their cost or our fee; but if a defendant will be

15   put out of business, that's not compliance.

16        So we make those decisions, and we try to exert

17   our influence on the expert, not the other way around.

18        THE COURT:  Well, let me ask you this.  I mean,

19   you say that -- I think that you said earlier that the

20   amount that the expert is paid is negotiated

21   post-settlement; is that right?

22        MR. PEREZ:  Yes, sir.  Yes, Judge.

23        There might have been some instances where it was

24   before when we're getting settlement offers.  But

25   oftentimes, more often than not, the lion's share of it is,
```

1    is post-settlement.

2          THE COURT:  Well, here's where that's a concern.

3    I mean, when a case is settled, to the extent there's any

4    indication that amounts you're being paid for your fee are

5    being negotiated with or paid to the expert, that would be

6    fee splitting, and that would be improper under the Florida

7    Bar Rules.  I don't see how it wouldn't.

8          To the extent there's a settlement, there should

9    be an amount -- to the extent there's any negotiation that

10   the amount you're getting paid for fees that would go to an

11   expert, that's improper fee splitting.

12         So I'm not sure how that can really be done.  I

13   mean, in every other case there's an amount that an expert

14   is paid.  And that's the amount you contract for and you

15   pay it.  And you all get your fee.  And you pay the expert

16   what he's contracted for.

17         If you're negotiating the amount of money that

18   you're being paid for a fee and paying some of that to an

19   expert, how are you not sharing your fee with an expert?

20         MR. PEREZ:  I'll be happy to elaborate, Judge.

21         Oftentimes when we're negotiating costs and fees,

22   he'll tell us, Listen, this is just too much for that cost.

23   And this is too much for that fee.

24         And I'll agree with them, Okay, we'll get with our

25   expert and reduce his cost.

```
 1          And I'll get with whoever my expert may be and
 2   say, Listen, I need to reduce your cost --
 3          THE COURT:  But that's pre-settlement.  That's
 4   pre-settlement.
 5          MR. PEREZ:  Right.  But even after, I'll tell him,
 6   I'm not going to pay you more than this, point blank.  And
 7   that's it, and they have to accept that.  And if they
 8   don't, I won't use them again.
 9          THE COURT:  Have you ever not used Mr. Childers in
10   a Longhini case?
11          MR. PEREZ:  Yes, Judge.
12          THE COURT:  You have?
13          MR. PEREZ:  That's correct.
14          THE COURT:  Okay.
15          MR. PEREZ:  I've used Mr. Patel.  Off the top of
16   my head, I have used Mr. Pablo Baez.
17          THE COURT:  I think this is a very precarious
18   situation in the way that these cases are run with these
19   experts having these relationships with the clients in the
20   way they do and the way that fees are negotiated for the
21   experts, both before and after settlement.
22          And I think this is something that's come to the
23   Court's attention and you should be very wary of.  There's
24   no other kind of case that I can think of in which these
25   kind of relationships are between the clients and the
```

1    experts and the attorneys.

2          And perhaps you all have the professional

3    experience and independence to deal with these experts, and

4    you're doing it completely appropriately.  But I don't know

5    that that's always happening.

6          And I think this is also a ripe area for defense

7    counsel to move to disqualify somebody like Mr. Childers

8    for being an expert in these kind of cases.

9          And you're really putting yourself out there by

10   relying upon somebody that has this much financial

11   incentive in these cases and as -- as he does.

12         I mean, the issues of bias and motivation and

13   things like that are a serious concern.  And I just think

14   that you all need to address this.  And it's something that

15   to the extent these cases go to trial or get to a further

16   stage is going to come up.

17         MR. PEREZ:  Understood, Your Honor.

18         Rest assured, the tail doesn't wag the dog at our

19   firm.

20         THE COURT:  Well, I understand what you're saying,

21   and, you know, you seem very able to control the situation

22   with Mr. Childers based on what you're telling me.

23         But even to the extent the money is not clearly

24   being demarcated between the client and your fee either

25   before or after settlement, that really implicates the

```
 1   5 series of the Florida Bar Rules concerning fee splitting.

 2          So, you know, I'm not really sure exactly what's

 3   going on there and him discounting his fees as opposed to,

 4   you know, negotiating with him on the front end.  I'm not

 5   sure that that's going to work.

 6          You know, we see things like that in kickback

 7   schemes in the case of medical practices and cases are

 8   brought where, you know, the practitioners will discount

 9   fees as opposed to taking something.  And that's supposed

10   to make it okay, and it doesn't.

11          And I'm not saying that that's happening here.

12          MR. PEREZ:  That's not, Judge.

13          THE COURT:  And I'm not saying it is.  But those

14   kind of reduction in fees as opposed to charging fees, you

15   know, that doesn't make it okay.

16          So I just -- I'm just cautioning you about this

17   because this is something that's come up in relation to

18   other attorney groups, and it's come up with this same

19   expert time and time again.

20          So I just want to make sure that you all are aware

21   of the Court's concern in this regard.

22          MR. PEREZ:  Appreciate it, Judge.  And we'll take

23   those issues the Court has mentioned very seriously and,

24   you know, keep our eye on things and make sure that doesn't

25   ever become an issue with our firm.
```

```
 1              THE COURT:  All right.  Thank you.

 2              MR. PEREZ:  Thank you, Your Honor.  May I sit?

 3              THE COURT:  Yes, yes.

 4              MR. GARCIA-MENOCAL:  Good morning, Your Honor.

 5              THE COURT:  Good morning.

 6              MR. GARCIA-MENOCAL:  Alfredo Garcia-Menocal on

 7   behalf of the firm.

 8              First of all, thank you for hearing us out today.

 9   I'm going to follow up with what Mr. Perez said.  We're not

10   going to make any excuses for our shortcomings.  We've

11   accepted them.  We see them as failures.  We're not proud

12   of them.  And we strive every single day to try to fix them

13   and prevent them in the future.

14              We've noted all the advice that you've given us.

15   And obviously we're going to go forward and take that into

16   consideration.

17              We've had issues -- we've had growing pains,

18   basically, which have led to these things.  Unfortunately,

19   we've let go of some staff, including attorneys.  One was a

20   former friend of ours that we knew from law school, a

21   senior attorney.  And it's unfortunate, but we deal with

22   it.  It's not an excuse.  We're looking to improve and to

23   fix the problem.

24              We've added some new staff to include two

25   paralegals six months ago.  We're looking for a federal
```

1   litigation experienced attorney to add and to help us out

2   with what we're doing.

3          And at the end of the day, we've always enjoyed

4   and earned the respect from our peers, from the judges that

5   we practice in front of.  And we want to continue that.  We

6   don't want to become a burden to the Court.  We want to,

7   you know, continuing practicing here and do what we do,

8   which is obviously litigate as senior attorneys and

9   advocate for our clients.

10         With respect to the expert situation, that's not

11  us.  We have -- it's news to us, that we're hearing this

12  for the first time.

13         Nobody tells us how to litigate our cases.  As

14  input, we do obviously rely on the expert's expertise for

15  remediation plans and, you know, dealing with the other

16  experts as to what can be done to fix these problems.

17         But as far as them telling us what to do in any of

18  our cases, it's never happened.  It's not going to happen

19  in our firm.

20         You said something about the possibility of fee

21  splitting.  That's obviously something that's very

22  concerning, and we're going to take that into account.

23         And I ask the Court, is there a particular

24  recommendation that we can have with these experts?  Can we

25  charge them a flat fee?  Because we never negotiate part of

```
 1    our fees into what they're charging, but we always try to

 2    negotiate down what they're invoicing us for at the end

 3    because it's part of our settlement to try to get to the

 4    number that we need with the other side.

 5              Is there something the Court can advise us or

 6    recommend?

 7              THE COURT:  No, I can't.  It's not my role to give

 8    you any advice in this regard.  It's only my role at this

 9    stage of the proceeding to provide for you the issues the

10    Court sees.

11              MR. GARCIA-MENOCAL:  Okay.  Just take a note that

12    we see what's going on.  We don't want to repeat these

13    failures.  We're moving forward to better our firm, to --

14    we've trained our staff.

15              We have weekly meetings where we not only go over

16    every single case with our staff, but we're also educating

17    them, hearing their concerns to prevent these future

18    mishaps from happening again.

19              And in the end, as far as sanctions are concerned,

20    we defer to the Court for whatever they deem appropriate.

21    However, we humbly ask that we not get sanctioned as this

22    is -- nothing has been willful or intentional disregard to

23    the Court's orders or the Federal Rules.

24              THE COURT:  Well, I appreciate that.  Like I said

25    at the beginning, I think that both of your responses are
```

1   probably -- you have the most comprehensive plan in place

2   to address the issues the Court's really concerned about,

3   which is the rules -- which is the rules and the orders.

4          You know, that being said, there have been some

5   slip-ups since.  I understand it's a growing process.  And

6   that may be why these proceedings go on for six months or a

7   year in order to verify that what you've done is

8   appropriate and takes everything into consideration.  I

9   don't know that that will happen, but that may be one

10  result of this.

11         So I understand what you're saying.  And I

12  appreciate that.  I'll take this all under consideration.

13         Now, to the extent you have -- the only advice I

14  can probably give you is to the extent you have any

15  concerns, you can always contact the Florida Bar --

16         MR. GARCIA-MENOCAL:  Sure.

17         THE COURT:  -- and get opinions from the Florida

18  Bar concerning anything that's happening.

19         And I don't mean to say that anything untoward is

20  happening.  And I'm not making any findings here today.

21  I'm just expressing to you the things that I've heard from

22  other attorneys, both in written responses and at the prior

23  hearings, and some concerns the Court has.

24         And I think it's fair and worthwhile to at least

25  flag these issues for you and express my concern.  Because

```
 1   it is very troubling to the Court as a whole the way that

 2   it's been alleged that some of these relationships are

 3   taking place concerning some of the experts and client

 4   contacts.

 5           And I only say -- and it's only relevant to these

 6   proceedings, because perhaps more in relation to other

 7   attorneys than you all, we have concerns that it's

 8   influencing how junior attorneys are litigating the cases.

 9   And that's why we're seeing some of the things that we're

10   seeing.

11           So that's where we're at right now.  Anything else

12   from either of you?

13           MR. GARCIA-MENOCAL:  Thank you very much, Judge.

14           MR. PEREZ:  No, Your Honor.  Thank you for the

15   time again.

16           THE COURT:  All right.  Thank you.

17           We'll be in recess.

18           (Proceedings adjourned at 10:47 a.m.)

19                         * * * * *

20

21

22

23

24

25
```

1               C E R T I F I C A T E

2

3          I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7    November 5, 2018

8

9        s\  Amie R. First
     _____
     Amie R. First, RDR, CRR, CRC, CPE
10   Federal Official Court Reporter
     United States District Court
11   Middle District of Florida

12

13

14

15

16

17

18

19

20

21

22

23

24

25